James C. **BRATTON**

v.

**METROPOLITAN LIFE INSURANCE CO.**

No. CV 04–7605 JVS.

United States District Court, C.D. California.

July 17, 2006.

Sara Smith Ray, Altman & Ray, Woodland Hills, CA, for James C. Bratton.

Brent M. Finch, Stone Rosenblatt Cha, Woodland Hills, CA, Eric R. McDonough, Seyfarth Shaw, Los Angeles, CA, for Metropolitan Life Insurance Company.

SELNA, District Judge.

**Proceedings:** Defendants' Motion for Summary Judgment.

Cause called and counsel make their appearances. The Court's tentative ruling is issued. Counsel for the parties inform the Court that they submit on the Court's tentative ruling. The Court GRANTS the defendants' motion for summary judgment and rules in accordance with the tentative ruling as follows:

The instant action involves a claim for long-term disability ("LTD") benefits pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff James C. Bratton ("Bratton") contests the denial of his claim for LTD benefits under the American Airlines Welfare Plan ("the Plan"), which is administered by Metropolitan Life Insurance Company ("MetLife"). Defendants MetLife and American Airlines, Inc. ("American Airlines") move this Court for an order granting summary judgment in their favor.

1. Procedurally, an initial claim is made to MetLife. Following a denial, the claimant may seek a second review from MetLife. Should that result in denial, the claimant may then seek review from the PBAC.

## I. BACKGROUND

Bratton worked at American Airlines from May 1995 until he left in October 2002, due to neck and back pain. Bratton worked as an Account Executive in Cargo Sales, which involved use of the telephone and computer, and occasional travel. In May 2002, Bratton stopped working due pain in his neck, and although he returned to work for approximately five weeks from August 28, 2002 to October 3, 2002, he found he was unable to perform his job duties. (Administrative Record ("AR") A106.)

The following represents a chronology of Bratton's medical reports submitted to MetLife and the American Airlines Pension Benefits Administration Committee ("PBAC")[1] and claim filings for LTD and associated decisions.

### A. 2002 Medical Reports

Bratton listed Dr. James Styner as his "primary attending physician" and Drs. David Edelman and Ronald Rothman[2] as other physicians in his initial Disability Claim Employee Statement. (AR A004.) In Dr. Rothman's July 12, 2002 report, he noted that Bratton presented a "several month history of pain in the neck with radiation into the left upper extremity all the way down to the fingertips accompanied by parasthesia in that distribution." (AR A073.) Routine x-rays showed mild degenerative changes in the spine and that the thoracic spine was "within normal limits." (AR A073.) Dr. Rothman, however, deferred diagnosis pending the results of an MRI but did order physical therapy and cervical traction. (AR A073–74.) Bratton underwent some physical therapy

2. Bratton began seeing Dr. Rothman in June 2002. (AR A004.)

and cervical steroid injections before returning to work August 28, 2002. (*See, e.g.,* AR A081, A089.) The Administrative Record does not contain the MRI results.

### B. *2003 Medical Reports / Claims Decisions*

In March 2003, Bratton saw Dr. Styner for an orthopedic evaluation related to his worker's compensation claim. (AR A039.) In his report, Dr. Styner noted that a July 2002 MRI revealed "bulging discs at several levels." (AR A040, A042.) Dr. Styner ordered a new MRI and wrote that he would seek a "neurological consultation for radicular symptoms." (AR A045.) Dr. Styner reported that Bratton was temporarily and totally disabled. (AR A046.)

In a second report dated April 1, 2003, Dr. Styner reviewed an MRI conducted May 25, 2003[3] and diagnosed "myoligamentous strain of the cervical spine with radicular symptoms, left side, with multilevel disc bulging."[4] (AR A050.) Again, Dr. Styner concluded that Bratton was temporarily and totally disabled but able to return to work in six weeks. (AR A050.)

On May 8, 2003, Bratton presented to Dr. Edelman, the neurologist to whom Dr. Styner referred Bratton. Dr. Edelman conducted a physical exam and noted full range of neck motion, normal strength, and normal gait. (AR A053–55.) Dr. Edelman ordered an EMG/NCV test and a follow-up visit in June. (AR A055). Dr. Edelman noted the disability status as "per treating physician." (AR A055.)

On June 19, 2003, Dr. Edelman reported that the electrodiagnostic study revealed no cervical radiculopathy and no signs of electrical instability. (AR A061.) All results from the exam were normal. (AR A061.) Moreover, Dr. Edelman noted that Bratton's disability status was neurologically "permanent and stationary." (AR A058.)

On June 24, 2003, Dr. Martin E. Offenberger prepared a MetLife Attending Physician Statement on behalf of Bratton, in which he diagnosed multilevel disc bulging and noted subjective symptoms, including cervical spine, left arm, and thoracic spine pain. (AR A006.) Dr. Offenberger recommended physical therapy, medication, and a psych consult for depression. (AR A006.) Dr. Offenberger also noted that Bratton was temporarily and totally disabled and that he may be able to return to work on August 26, 2003. (AR A007.)

Bratton applied to MetLife for long-term disability under the Plan on August 11, 2003. On August 12, 2003, Dr. Styner noted in a workers compensation report that Bratton stated he was worse. (AR A064.) Dr. Styner further indicated that the range of motion of the cervical spine was within normal limits. (AR A064.) Finally, Dr. Styner diagnosed myoligamentous strain of the cervical spine and multilevel disc bulging but found no radiculopathy or neuropathy. (AR 065.) Dr. Styner noted that Bratton was temporarily and totally disabled but would be able to return to work in five weeks. (AR A066.)

On August 14, 2003, in an initial interview with MetLife, Bratton explained his

---

3. The Court notes that the date must be wrong because the report predates the MRI.

4. Specifically, the MRI revealed: "2 mm disc bulge at C5–6, T–1, T2–3 and T3–4 with mild left sided C5–6 central canal narrowing and mild right-sided central canal narrowing at T3–4. Additionally, there is a 2 mm osteophyte ridging at the narrowed C6–7 level where there is a mild left-sided central canal narrowing. There is a 3 mm posterior disc bulge at T1–2 where there is mild to moderate left-sided central canal narrowing and mild to moderate left C4–5 facet hypertrophy." (AR A049–50.)

condition to MetLife and the limitations to his lifestyle due to the pain he was experiencing, including pain from sitting for too long and difficulty with driving because of pain when turning his head. (AR A106.) Bratton also described his job as sedentary. (AR A106.)

On September 26, 2003, Dr. Styner prepared a MetLife Physician's Report of Physical Capacity, indicating that Bratton was still temporarily and totally disabled but should be able to return to work in November 2003. (AR A037–38.)

MetLife denied Bratton's application on September 29, 2003 because it was submitted more than one year after the claimed disability began.[5] (AR A013–14.) Bratton appealed the denial on September 30, 2003, which MetLife upheld on a second review. (AR A010–11.) Bratton then filed a Second Level Appeal with the PBAC, which determined that the one-year rule should be waived given the circumstances presented. (AR AA062.)

Thereafter, MetLife reviewed the substance of Bratton's claims and Dr. Styner's reports. In addition to the reports described above, Dr. Styner also provided a worker's compensation report dated November 4, 2003, indicating that although Bratton complained of worsening pain, the range of motion remained normal. (AR A068–70.) Moreover, the diagnoses remained the same, as did the disability status. (AR A069.)

### C. 2004 Medical Reports / Claims Decisions

MetLife denied Bratton's claim on January 12, 2004. (AR A016.) In its letter of denial, MetLife explained that the "information in the file does not provide substantial medical information to support the restrictions and limitations which would prevent you from performing the duties of a sedentary occupation." (AR A016.) The letter further provided that Dr. Styner's notes noted normal range of motion and no evidence of radiculopathy or neuropathy. (AR A016.) The letter concluded that "there is no objective medical evidence to support that you were unable to do your own occupation in Promotional Sales." (AR A016.) The letter also provided instructions on how to file a request for second review.

On February 13, 2004, Bratton filed a request for a second review and inquired as to why MetLife did not mention Kaiser Permanente records in its letter.[6] (AR A032.) Bratton requested a copy of his file and offered to provide additional materials if his file showed missing information. (AR A032.) MetLife upheld its denial on February 18, 2004 and informed Bratton on how to appeal the decision to the PBAC. (AR AA056–57.)

On April 23, 2004, Bratton presented to Dr. Steven Perry, D.C., who completed a Treating Physician Statement. (AR AA073.) Dr. Perry diagnosed cervical IVD disorder/psychological overlay. (AR AA073.) He prescribed work restrictions such as no lifting over ten pounds, no prolonged sitting or standing, and no overhead loading. (AR AA073.)

In May 2004, Bratton saw Dr. Soheil Younai, a hand surgeon, who completed a Primary Treating Physician's Progress Report for the California Division of Worker's Compensation. (AR AA074.) Dr. Younai diagnosed carpal tunnel syndrome and spinal stenosis in cervical region. (AR AA074.) Dr. Younai noted in his report that Bratton was evaluated by spine specialist Dr. Kohan, who felt that

---

5. Under the plan, employees must file claims within one year of the disability. (AR A339.)

6. Dr. Rothman was the Kaiser Permanente physician.

Bratton had a long term disability due to severe cervical radiculopathy.[7] (AR AA074.) Dr. Younai's treatment plan required no prolonged sitting, no repetitive fine manipulation, and no bending stooping, or lifting. (AR AA074.)

On May 19, 2004, Bratton's counsel informed MetLife that Bratton was appealing the decision to the PBAC, requested a copy of Bratton's file and Plan documents, and attached medical reports from Dr. Younai and Dr. Perry. (AR A020.) Bratton mailed an appeal to the PBAC on May 20, 2004, again attaching medical reports from Drs. Younai and Perry. (AR AA048–49.) The PBAC sent Bratton's counsel a copy of the Plan and directed MetLife to send all files upon which it relied in denying Bratton's claim. (AR AA 046–47.)

On July 26, 2004, the PBAC received Bratton's Application for Second Level Appeal, dated June 10, 2004, which included the reports from Drs. Perry and Younai. (AR AA035–37.) In August 2004, the PBAC forwarded Bratton's file to Elite Physicians, A Division of Network Medical Review Company, Ltd. ("NMR").[8] (AR AA0023–27.) Dr. Clayton T. Cowl reviewed Bratton's file, including the Kaiser report, Dr. Styner's reports, Dr. Edelman's report, Dr. Offenberger's report, a psychological report by Dr. Thomas A. Curtis, Dr. Perry's report,[9] Dr. Younai's report, as well as various test results and Bratton's job description. (AR AA016.) Dr. Cowl listed the primary diagnosis as "degenerative disc disease of the cervical spine with persistent neck discomfort." (AR AA016.) Dr. Cowl wrote that Bratton would be able to participate in his sedentary occupation and that

> The current status report provided from the treating healthcare provider on 04/23/04 indicated that he could lift up to 10 pounds and push/pull as well as stair climb, all activities which could be accomplished in a sedentary work environment especially with accommodations such as a headset while using the phone and appropriate computer setup with appropriate ergonomic controls.

(AR AA017.) Dr. Cowl further noted that Bratton's anxiety should not prevent his participation in his occupation and that work restrictions imposed by Bratton's doctors did not preclude employment in a sedentary job. (AR AA018.)

The PBAC affirmed the denial of benefits on September 4, 2004. (AR AA001.) In its letter of denial to Bratton's counsel, the PBAC explained the Plan, the procedural history of Bratton's claim, the review process including referral to the NMR and Dr. Cowl, Dr. Cowl's findings, and that Bratton had the right under ERISA to institute a civil action. (AR AA001–06.)

## II. DISCUSSION

### A. Standard of Review

■■■ As a preliminary matter, the Court must determine what standard of review it will apply in reviewing the denial of Bratton's claim for LTD. When an ERISA plan gives the plan administrator discretion to determine eligibility for benefits, a district court must review the ad-

---

**7.** The Court notes that there are no medical records from Dr. Kohan in the Administrative Record.

**8.** Bratton takes issue with the findings of NMR and avers that because they have served as reviewers for MetLife on many occasions in the past, they are obviously biased towards denying a claim. (Pl. Opposition Br., pp. 4–

6.) It is of course entirely possible that administrators submit medical reports to NMR because they are experienced in occupational medicine. Nonetheless, the Court is aware of NMR's frequent evaluation of such claims.

**9.** Dr. Perry's name was not listed.

ministrator's denial of benefits under a deferential "abuse of discretion"—or "arbitrary and capricious"—standard of review. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The law is settled that the denial of benefits is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1089 (9th Cir.1999) (quoting *Firestone,* 489 U.S. at 115, 109 S.Ct. 948).

■ It is clear that the Plan confers discretion upon MetLife. The Plan states that

> [i]n carrying out their respective responsibilities under the plan, the plan administrator and other plan fiduciaries shall have discretionary authority to interpret the terms of the plan and to determine eligibility for and entitlement to plan benefits in accordance with the terms of the plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect under the plan, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(AR A147.) In the LTD section, MetLife is named the Plan administrator. (AR A338.) The Plan clearly vests discretion in MetLife. *See Friedrich v. Intel Corp.,* 181 F.3d 1105, 1110 n. 5 (9th Cir.1999).

Nonetheless, Bratton contends that the Court should apply a *de novo* review for the following reasons: (1) under California law, discretionary clauses violate the insured's rights and render insurance contracts fraudulent (Pl. Trial Brief, p. 5) and (2) MetLife has a conflict of interest (Pl. Trial Brief, pp. 6–7).

Bratton's first argument that California law disfavors discretionary clauses is based on an opinion letter allegedly issued by the California Department of Insurance pursuant to the California Insurance Code section 12921.9. The Court denies Bratton's request to heighten the standard of review on the basis on this opinion letter. First, as Bratton concedes, this opinion letter is not binding authority. (Pl. Trial Brief, p. 5.) Rather, the opinion letter merely states the opinion of the insurance commissioner, and does not have the force of law. *Baer v. Associated Life Ins. Co.,* 202 Cal.App.3d 117, 123, 248 Cal.Rptr. 236 (1988). Second, the opinion letter is not a part of the administrative record, and in fact, has not been provided to this Court for analysis. Accordingly, the Court declines to apply a *de novo* standard on this basis.

■ Next, Bratton contends that a heightened review standard is necessary because, according to Bratton, MetLife has a conflict of interest. (Pl. Trial Brief, p. 7.) If a plan administrator has a conflict of interest, the degree of deference employed by the court may vary. *Snow v. Standard Ins. Co.,* 87 F.3d 327, 331 (9th Cir.1996) (overruled on other grounds). An inherent conflict of interest exists where the plan administrator is also the insurer and "must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (internal citations omitted).

Although Bratton alleges that MetLife is both the administrator and the insurer, this allegation is false. In fact, according to the Plan, "The LTD plan is self-funded through employee contributions deposited to a trust established under Section 501(c)(9) of the Internal Revenue Code. Benefits are paid from trust assets." (AR A338.) In other words, MetLife does not insure the LTD Plan. Moreover, MetLife does not make the final claim determina-

tion; rather its decisions are subject to appeal to the PBAC.[10] Accordingly, the Court finds that MetLife does not have an inherent conflict.

Nonetheless, Bratton argues that Met-Life does have a conflict of interest and asserts that this conflict is evidenced by MetLife and American Airlines alleged misstatement of the evidence, failure to adequately investigate the claim, disregarding self-reports of pain, and failure to follow claims procedures. For these reasons, Bratton argues for a *de novo* standard of review.

A court must "review the decisions of an apparently conflicted employer-or insurer-fiduciary under the tradition abuse of discretion standard unless it appears that the conflict may have influenced the decision." *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794, 797–98 (9th Cir.1997). In order to demonstrate that a conflict actually influenced the decision of a plan administrator, the "affected beneficiary must come forward with 'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary.'" *Id.* (quoting *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322 (9th Cir.1995)). "If the beneficiary satisfies that burden, our review remains for abuse of discretion, but it becomes less deferential." *Id.* Moreover, if the affected beneficiary comes forward with material evidence of a violation of the plan administrator's fiduciary obligation, the plan then bears the burden of rebut-

ting the presumption of a presumptively void decision by producing evidence to show that the conflict of interest did not affect its decision to deny or terminate benefits. *Id.* If the plan fails to carry its burden, the court's review is *de novo*, without deference to the discretion of the administrator. *Id.*

Bratton first contends that MetLife and American Airlines misstated the evidence and that this shows self-interested decision-making. (Pl. Trial Brief, pp. 9–10.) Bratton, however, provides the Court with no examples of such occurrences and a review of the Administrative Record by the Court does not reveal any misstatements.[11]

Next, Bratton asserts that MetLife and American Airlines failed to independently examined Bratton. Bratton, however, provides no basis for this requirement and a review of the Plan does not reveal that MetLife or American Airlines are required to conduct an independent examination. Moreover, the cases cited to by Bratton— *Kunin v. Benefit Trust,* 910 F.2d 534 (9th Cir.1990) and *Booton v. Lockheed,* 110 F.3d 1461 (9th Cir.1997)—do not stand for the proposition that an independent review is required.

Third, Bratton contends that the fact that MetLife and American Airlines allegedly disregarded his reports of pain evidences self-interested decision-making. Bratton asserts that because American Airlines also opposes Bratton's request for worker's compensation, it is to their benefit to construe all evidence in favor of disregarding benefits. (Pl. Trial Br. P. 10.) A review of the Administrative Rec-

---

10. Whether the PBAC has a conflict of interest is not argued by Bratton.

11. In support of his argument, Bratton cites to *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L.Ed.2d

1034 (2003). In *Nord,* the Supreme Court held that an administrator need not accord special deference to treating physicians. The Court does not find *Nord* relevant to the issue of misstated evidence.

ord does not in fact reveal that Defendants disregarded Bratton's reports of pain. Moreover, the Court notes that Bratton fails to present any evidence to support its allegation that American Airlines was motivated by a desire to avoid paying worker's compensation benefits. Without such evidence the Court is not prepared to find a conflict of interest.

Finally, Bratton asserts that Defendants' evidenced self-interested decision-making by failing to follow claims procedures and misstating the steps they took in investigation. Specifically, Bratton contends that (1) in its January 12, 2004 denial letter, MetLife failed to explain precisely what Bratton must do to perfect his claim, (2) the January 12, 2004 letter explained that its medical staff reviewed Bratton's medical report but in fact there is no such review in the Administrative Record, (3) the letter indicates that MetLife wrote to Dr. Styner to obtain clinical findings to support Bratton's claim of disability when in fact there is no evidence in the Administrative Record that MetLife asked this particular questions, and (4) the letter states that no objective medical evidence was presented when in fact the Plan does not require objective medical evidence.

In opposition, Defendants contend that they did not disregard Bratton's subjective complaints but that they did require objective medical evidence of disability. (Opp'n to Pl. Trial Brief, pp. 5–7.) Moreover, Defendants assert that it is proper for them to require objective evidence of disability and that the evidence submitted did not support Bratton's claim. (Opp'n to Pl. Trial Brief, p. 5 *citing Jordan v. Northrop Grumman Corp.* 370 F.3d 869, 877 (9th Cir.2004)).

First, the Court notes that the January 12, 2004 letter was not deficient. Under ERISA, when a claim is denied, the administrator

> shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: (1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f). In other words, the denial must be stated "in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe more information is needed to make a reasoned decision, they must ask for it." *Booton,* 110 F.3d at 1463.

The January 12, 2004 letter complies with these requirements. Specifically, the letter informed Bratton as to what steps he was required to take to file a Request for Second Review, including an address for an application, a timeline, and what documents to provide. (AR A016–17.) Moreover, the letter explains how to pursue a formal appeal with the PBAC, the contact information, and a time-line as well. (AR A016–17.) Finally, the letter indicates how MetLife came to its decision—it requested medical reports from Dr. Styner and it had its medical staff review those reports. That there is no medical review in the Administrative Record is irrelevant. The Court does not find the information contained in this letter evidence of self-interested decision-making.

Bratton's final argument for a finding of a conflict of interest is that the denial letter indicated a lack of medically objective evidence when in fact the Plan does not require objective medical evidence.[12] (Pl. Trial Br., p. 11.) Under the Plan, disability is defined as follows:

During the elimination period and the first 24 months for which LTD benefits are payable, you are considered totally disabled if you are not gainfully employed in any type of job for wage or profit and are unable to perform major and substantial duties of your own occupation because of sickness or accidental bodily injury.

After 24 months, during which benefits are payable, you are considered totally disabled if you are not gainfully employed in any type of job for wage or profit and are unable to perform major and substantial duties of any occupation or employment for wage or profit for which you have become reasonably qualified by training, education, or experience.

(AR A338.) Clearly, the definition of disability does not require a showing of objective medical evidence to establish disability.

■ Implied additional plan terms are generally disfavored. *Canseco v. Construction Laborers Pension Trust for Southern California,* 93 F.3d 600, 608–09 (9th Cir.1996). The Court notes that some in some cases, courts have addressed whether the requirement of objective medical evidence is evidence of a conflict of interest while other courts have assessed it as a matter of abuse of discretion. *Compare Jordan v. Northrop Grumman Welfare Benefit Plan,* 370 F.3d 869, 877 (9th Cir.2004); *Sabatino v. Liberty Life Assurance Co. of Boston,* 286 F.Supp.2d 1222, 1231 (N.D.Cal.2003) *with Martin v. Continental Cas Co.,* 96 F.Supp.2d 983, 993 (N.D.Cal.2000); *Voight v. Metropolitan Life Ins. Co.,* 28 F.Supp.2d 569, 578–80 (C.D.Cal.1998).

In *Jordan,* the Ninth Circuit declined to find a conflict of interest even though the defendant indicated in its denial letter that it required "objective proof." 370 F.3d at 877. As the court explained, the administrator had requested evidence that the plaintiff could not perform her work duties. *Id.* The court determined that requiring objective evidence of illness or injury may be a conflict of interest where an illness cannot be objectively established; however, there was no conflict of interest where an administrator found a lack of objective evidence that the employee could not work because of the illness. *Id.*[13]

In consideration of this precedent, the Court does not find that MetLife's demand for objective medical evidence requires a less deferential standard of review. As in *Jordan,* MetLife did not require evidence of illness, but rather required "objective

**12.** Bratton argues this as a basis for heightening the standard of review and for finding an abuse of discretion. The Court will consider whether this was an abuse of discretion below.

**13.** Bratton cites to *Sabatino* as an instance where a court heightened the standard of review because objective medical evidence was required. The Court does not read *Sabatino* to stand as described by Bratton. Rather, a conflict of interest was found in *Sabatino* where the administrator first denied a claim based on a pre-existing condition exclusion, then because of a failure to provide medically objective evidence of disability, and finally again because of a preexisting condition. 286 F.Supp.2d at 1231. The court, however, found a breach of fiduciary duty because the administrator relied on an independent medical opinion it sought which mis-characterized the crux of the plaintiff's claim, and not because the administrator required objective medical evidence. *Id.*

medical evidence to support that [Bratton was] unable to do [his] own occupation in Promotional Sales." (AR A016.) Because MetLife and the PBAC are charged with determining whether an employee is "unable to perform major and substantial duties of [his] own occupation," the Court cannot say that requiring objective medical evidence of this represents a breach of fiduciary duty.

As noted above, there is no inherent conflict of interest present on the facts here. Moreover, the Court finds that Bratton has not produced "material, probative evidence ... tending to show that [MetLife]'s self-interest caused a breach of [its] fiduciary obligations to [Bratton]." *Atwood,* 45 F.3d at 1323. Therefore, the Court will apply the abuse of discretion standard.

 When a court reviews for abuse of discretion, "it is because the plan has put the locus for decision in the plan administrator, not in the courts, so we cannot substitute our judgment for the administrator's." *Jordan,* 370 F.3d at 879. A court can set aside an administrator's discretionary decision only when it is arbitrary and capricious. *Id.; Snow,* 87 F.3d at 330. In other words, this Court will uphold the decisions of MetLife and the PBAC so long as it is "grounded on *any* reasonable basis." *Jordan,* 370 F.3d at 879 (emphasis is original). In order to be subject to reversal, the finding that the employee is not totally disabled must be clearly erroneous. *Id.* Moreover, the fact that an administrator's decision is in conflict with evidence in the record is not alone sufficient to meet the clearly errone-

ous standard. *Martin v. Continental Casualty Co.,* 96 F.Supp.2d 983, 990 (N.D.Cal.2000) (citing *Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1473 (9th Cir.1993)). Rather, a " 'firm and definite conviction that a mistake has been committed' is necessary to meet this standard." *Martin,* 96 F.Supp.2d at 990 (quoting *Taft,* 9 F.3d at 1473).

 When an abuse of discretion standard obtains in the ERISA context, a motion for summary judgment is the conduit to bring the legal question before the Court, although the usual tests of summary judgment do not apply. *Bendixen v. Standard Insurance Co.,* 185 F.3d 939, 942 (9th Cir.1999). To evaluate Bratton's claim, the Court must conduct, pursuant to Federal Rule of Civil Procedure 52, a bench trial based on the administrative record and such other evidence as the Court admits. *Kearney,* 175 F.3d at 1094–95.

### B. *Review of the Record*

Bratton contends that MetLife and the PBAC abused their discretion under the Plan by requiring medically objective evidence, by improperly labeling Bratton's job as sedentary, and by allegedly discounting the diagnoses of Bratton's doctors. The Court will address each argument in turn.

### 1. *Medically Objective Evidence* [14]

 Bratton's first argument is that MetLife abused its discretion by requiring "objective medical evidence to support" that Bratton was unable to perform his occupation. (AR A016.) Bratton contends

---

14. Although the Court analyzes this issue as if it were a requirement, there is a substantial argument that in its denial letter, MetLife was doing no more than adverting to two types of evidence before it: objective and subjective. There is no express requirement that there

must be objective evidence. Rather, MetLife simply adverts to the presence of one type of evidence (subjective) and the absence of another (objective) in reaching its conclusion to deny benefits.

that the Plan does not have any such restriction and that MetLife wrongly wrote a new term into the Plan. (Pl. Trial Br. pp. 11–12.) MetLife, on the other hand, asserts that it did not abuse its discretion in requiring objective medical evidence. (Defendants' Cross–Motion, pp. 19–20.)

■■■ Generally, it is an abuse of discretion for an administrator to make a decision that conflicts with the plain language of the plan. *Atwood,* 45 F.3d at 1323–24. Moreover, the Ninth Circuit has found an abuse of discretion where limitations not present in the plan are used to deny coverage. In *Saffle v. Sierra Pacific Power Co.,* 85 F.3d 455, 459 (9th Cir.1996), the Ninth Circuit held that an administrator abused its discretion by deeming an employee able to perform work with accommodation where the plan language required that the employee be "completely unable to perform each and every duty" of her position and did not mention accommodation. The Court found the addition of the accommodation requirement to be unreasonable. *Id.* Similarly, in *Canseco v. Construction Laborers Pension Trust,* 93 F.3d 600, 609 (9th Cir.1996), where the plan made clear that payments could only be made on a beneficiary's application, the administrator interpreted this to mean that a delayed application acted as a waiver of entitlement to retroactive payment. The Ninth Circuit found that adding this requirement was an abuse of discretion simply because the plan did not make application a prerequisite for eligibility and by adding the term, a whole class of employees were foreclosed from benefits they deserved. *Id.*

Courts have also found that the addition of a term may not necessarily be an abuse of discretion. For example, in *Saffle,* while finding an abuse of discretion for reading "accommodation" into the opera-

tive plan, the Ninth Circuit found reasonable the administrator's interpretation of the plan language requiring that the employee be unable to perform "each and every" duty to be reasonable. *Saffle,* 85 F.3d at 458. There, the administrator interpreted this to mean "substantial portions." *Id.* The Ninth Circuit found this language reasonable even though it was not present in the plan language given that to interpret the language as "all" would mean that no employee would ever be qualified for benefits and to interpret the language literally would effectively convert the language to a partial disability benefit rather than total disability. *Id.*

The Court finds MetLife's requirement does not limit the Plan's terms in an offensive way as found in *Saffle* and *Canseco.* Rather, the term used is more similar to the "substantial portions" requirement held reasonable in *Saffle.* In *Martin,* 96 F.Supp.2d at 992, the court noted that a plan "cannot reasonably be expected to incorporate all of the terms salient to the determination of a claim." Moreover, neither ERISA nor Ninth Circuit precedent demands that "administrators obtain all definitions from the plan, only that such definitions are in accordance with the plan." *Id.* In other words, the Court must determine whether requiring objective medical evidence of inability to perform one's job was an arbitrary distinction. As *Saffle* makes clear, merely being non-textual does not mean that the interpretation is unreasonable.

Here, the Plan language at issue requires that the employee be "unable to perform major and substantial duties." (AR A338). Unlike in *Canseco,* where the added language foreclosed benefits for a class of employees, the Court considers the requirement here to be a mere interpretation of the Plan's language. Moreover, in *Voight v. Metropolitan Life Ins. Co.,* 28

F.Supp.2d 569, 578–80 (C.D.Cal.1998), the court recognized that where the administrator was given the discretionary authority to construe the terms of a plan, the plaintiff must prove that it was arbitrary and capricious to require objective proof of disability. *See Martin,* 96 F.Supp.2d at 993 (citing *Voight,* 28 F.Supp.2d at 580). Bratton has provided no proof that the objective medical evidence requirement was arbitrary. Rather, the Court agrees with Defendants that a finding of disability based on mere subjective complaints would open the Plan up to malingering and would greatly hamper MetLife from exercising its fiduciary role of scrutinizing requests for benefits. (Defendants' Opposition, p. 6 citing *Coffman v. Metropolitan Life Ins. Co.,* 217 F.Supp.2d 715, 732 (S.D.W.Va. 2002).)

Most importantly, the Court notes that this is not a case where MetLife has required objective evidence of a disability. Courts have found an abuse of discretion where an administrator has required objective evidence of a disability, especially where the disability cannot be proven by objective evidence. *See Mitchell v. Eastman Kodak,* 113 F.3d 433 (3d Cir.1997). Rather, here MetLife required objective proof that Bratton could not substantially perform his occupation, not proof of his illness. The Court does not find this an unreasonable or arbitrary interpretation of the Plan's requirement.[15]

### 2. *Sedentary Occupation*

■ Bratton contests MetLife's description of his job as sedentary. (PL. Trial Br., p. 14.) The argument is not well taken because Bratton himself described his position as sedentary. (AR A106.) Ac- cordingly, MetLife did not abuse its discretion in so defining Bratton's occupation.

### 3. *Diagnoses by Bratton's Doctors*

■ Finally, Bratton contends that MetLife and the PBAC abused their discretion when they "ignore [sic] the information from the treating physicians." (Pl. Trial Br., p. 14.) Defendants, on the other hand, assert that they are entitled to rely on independent medical evidence and that it was not improper to refuse to accord special deference to Bratton's treating physicians. (Defendants' Cross Motion, pp. 21–23.)

■ Under the "treating physician rule," the opinions of treating physicians are accorded greater deference based on the idea that a treating physician has had more opportunity to get to know the patient. In *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), the Supreme Court rejected the application of the "treating physician rule" to ERISA cases, and held that

> Courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.* at 972, 123 S.Ct. 1965. The Ninth Circuit adopted this ruling in *Jordan,* 370 F.3d at 879.

Given the appropriate deferential review, so long as the record demonstrates that MetLife and the PBAC had a reasonable basis for finding that Bratton's medical condition did not totally disable him

---

**15.** Moreover, the Court notes that MetLife decisions are subject to review by the PBAC. In its rejection letter, the PBAC relied on the opinion of an independent medical reviewer as the basis for denial. Whether this was reasonable is discussed below.

such that he was unable to perform substantial duties of his occupation, the denial of benefits was not arbitrary, even if contrary to the recommendation of Bratton's physicians. *See id.*

The Court finds MetLife's denial of benefits and finding that the information provided does not support "the restrictions and limitations which would prevent you from performing the duties of a sedentary occupation" (AR A016) is neither arbitrary nor capricious. *Firestone Tire,* 489 U.S. at 115, 109 S.Ct. 948. Although Dr. Styner's reports did contain the conclusory statement that Bratton was "temporary and totally disabled," (AR A046, A050, A066, A069), in each and everyone of the reports, Dr. Styner noted (1) that the range of motion of the cervical spine was within normal limits, and (2) that although there was some disc bulging, there was no radiculopathy or neuropathy per EMG/NCV testing (AR A050, A064–065, A068–069). Moreover, Dr. Styner noted in at least one medical report that muscle strength was normal (AR A043) and Dr. Edelman indicated that Bratton's gait and muscle strength were normal. (AR A053–55.) The Court cannot say that based on the objective findings of normal range of motion, gait, and muscle strength and absence of radiculopathy/neuropathy, that it was unreasonable for MetLife's medical review staff to conclude that a lack of substantial information indicating that Bratton could not perform his sedentary position was present or for MetLife to rely on the findings of its own review staff over those of Dr. Styner.

Additionally, MetLife's decision was reviewed by the PBAC. In addition to relying on Dr. Styner's reports, the PBAC's independent medical reviewer, Dr. Cowl based his decision on further reports from

Bratton's doctors, including Drs. Younai and Perry. (AR AA016.) Although Dr. Styner had found temporary disability, Dr. Cowl determined that Bratton should be able to perform his sedentary occupation. (AR AA017.) The PBAC, in turn, chose to base its denial on Dr. Cowl's conclusions rather than those of Bratton's physicians.

The Court finds reliance on the opinion of Dr. Cowl reasonable for the following reasons. First, the Court notes that Bratton's own doctors were equivocal as to whether Bratton's condition prevented him from performing a sedentary occupation. Dr. Perry, a chiropractic doctor, noted that Bratton could lift ten pounds, push/pull, and climb stairs, which Dr. Cowl determined were activities that could be accomplished in a sedentary occupation. (AR AA017, referring to AA073.) Dr. Younai, on the other hand, reported a permanent disability of no prolonged sitting and diagnosed spinal stenosis in cervical region. Second, Dr. Younai is a hand surgeon and not an expert in back or neck injuries, and thus it was not un-reasonable for the PBAC to rely on the opinion of Dr. Cowl, who is Board Certified in Internal Medicine, Preventative Medicine (Occupational Medicine), and Pulmonary Diseases (AR AA019). Accordingly, it was entirely reasonable to rely on the independent report of Dr. Cowl.

Of course, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker,* 123 S.Ct. at 1972. The Court cannot say that this happened here. First, the Court notes that Bratton's contacts with his treating physicians were rather brief and sporadic, even at time meeting solely for the purpose of having a worker's compensation claim form completed. More importantly, however, both MetLife [16] and the PBAC

16. It is of no matter that MetLife did not

consult independent physicians to review

had medical staff review the medical evidence submitted by Bratton. They simply based their decision on the conclusions of their own medical consultants rather than those of Bratton's doctors. Because reasonable minds could have accepted the conclusions underlying the denial, the Court will not substitute its own judgment for that of MetLife or the PBAC. *See Voight,* 28 F.Supp.2d at 580.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that MetLife and the PBAC did not abuse their discretion in denying Bratton's claim for disability benefits. Defendants' motion is granted and Defendants are entitled to judgment. Counsel for defendants' shall prepare, serve and lodge, forthwith, a proposed judgment consistent with this Court's ruling.